# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of | No. 53377-4-II |
| L.K. | |
| | PUBLISHED OPINION |

WORSWICK, J. — Former RCW 71.05.215 (2018) establishes an involuntarily committed person's right to refuse antipsychotic medication and requires that the State attempt to obtain such a person's informed consent to treatment. The State is not relieved of this obligation merely because a physician believes an attempt to obtain informed consent would be futile.

LK appeals a superior court order authorizing the involuntary administration of antipsychotic medications. LK argues that the State failed to attempt to obtain her informed consent as required by statute, thereby violating her right to due process and rendering the order authorizing the involuntary administration of antipsychotic medication unlawful. We agree, reverse the superior court's order, and remand to the superior court to vacate the order authorizing involuntary administration of antipsychotic medication.

### FACTS

LK was diagnosed with schizoaffective disorder, bipolar type, and has been hospitalized at Western State Hospital (WSH) six times, most recently in August 2017. In February 2019, while LK remained hospitalized, her psychiatrist at WSH, Dr. Nagavedu Raghunath, petitioned

for an order granting the involuntary treatment of LK with antipsychotic medication.

Specifically, Dr. Raghunath sought to treat LK with new medications: "Risperidone by mouth and later, Risperidone Long Acting Injectable; Fluphenazine Intramuscular if oral Risperidone refused." Clerk's Papers (CP) at 48.

The day before the hearing on the petition, the State secured LK's signature on a "twenty-four hour medication notice." CP at 53. This notice documents LK's understanding that she may refuse her medications the day prior to the hearing. LK indicated on the form that she agreed "to remain under medication as prescribed." CP at 53.

The following day, at the hearing on the petition, Dr. Raghunath testified that LK was experiencing significant delusions. Dr. Raghunath explained that LK had responded well to treatment with Clozaril in the past, but in January she refused to take it. In February, she stopped all medications and began decompensating.

Dr. Raghunath testified that he had neither prescribed nor discussed treatment with risperidone or fluphenazine with LK. Instead, Dr. Raghunath focused on LK's previous resistance to treatment with Clozaril:

> Her kind of reason for not taking medication can vary [sic] anything from Clozaril needed regular blood draws to see how she is reacting to that, whether she is developing any kind of side effects to that. But she said that she has no blood in her body to give, and so she doesn't want to have that medication. Then she said that it makes her too drowsy. She is not able to get up in the morning . . . . Then she also said that it makes her too tired during the day. So—and of course, she also said that she doesn't think she needs that medication because she has no mental illness.

Report of Proceedings (March 1, 2019) (RP) at 8. Dr. Raghunath acknowledged that "[n]o discussion has happened" with LK about the newly proposed treatment for which he sought authorization to involuntarily administer.

The superior court commissioner entered findings of fact and conclusions of law supporting an order authorizing involuntary treatment with antipsychotic medications. As to LK's consent to treatment, the commissioner focused on Dr. Raghunath's testimony about LK's feelings toward treatment with Clozaril and found: "[LK] has refused to consent to treatment with antipsychotic medication for the following reasons[.] She says she does not have enough blood in her body, that it makes her tired and that she does not have a mental health disorder." CP at 56. The commissioner concluded that LK may be involuntarily treated with the antipsychotic medication requested in the petition.

LK moved to revise the commissioner's order. At a hearing before a superior court judge on the motion to revise, LK argued, in relevant part, that the State failed to attempt to obtain her informed consent to the proposed treatment. The superior court denied LK's motion to revise. The superior court reasoned:

> She's not taking her medications. She's refused medications for a variety of delusional beliefs. I think that an attempt to obtain informed consent from somebody who is actively psychotic, schizophrenic, threatening, abusive, disrobing, etc., *is an exercise in futility*. It's not what I think the statute contemplated.
> . . . .
> Informed consent also I think implies that the person has a degree of competency such that they can choose between an alternative course in a rational thought process, as opposed to a delusional belief system.

RP (March 22, 2019) at 20 (emphasis added).

LK appeals the superior court's order denying her motion to revise the commissioner's ruling.

ANALYSIS

LK argues that the superior court violated former RCW 71.05.215, former RCW 71.05.217 (2016), and her due process rights by affirming the order authorizing the involuntary administration of antipsychotic medications when the State had failed to attempt to obtain her informed consent. We agree.

I. LEGAL PRINCIPLES

A person "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Washington v. Harper*, 494 U.S. 210, 221-22, 110 S. Ct. 1028, 108 L. Ed. 2d 178 (1990). Moreover, an involuntarily committed person possesses a statutory right to refuse the administration of antipsychotic medication. Former RCW 71.05.215(1); former RCW 71.05.217(7).[1] But the right to refuse medication is not absolute. Our Supreme Court has recognized certain State interests that are sufficiently compelling to justify overriding a patient's objection to medical treatment, including the preservation of life, the protection of interests of innocent third parties, the prevention of suicide, and the maintenance of the ethical integrity of the medical profession. *In re Det. of Schuoler*, 106 Wn.2d 500, 508, 723 P.2d 1103 (1986).

---

[1] Former RCW 71.05.215 and former RCW 71.05.217 are the statutes applicable to LK's case. Both statutes were subsequently amended, most recently in 2020 by LAWS OF 2020, ch. 302, §§ 30, 31. The amendments have no substantive impact on our analysis or holding.

The Due Process Clause of the United States Constitution requires procedural safeguards to ensure a person's interests are taken into account before authorizing involuntary medication. *Harper*, 494 U.S. at 233. In *Harper*, the United States Supreme Court held that a Washington Department of Corrections policy for the involuntary administration of antipsychotic drugs to inmates satisfied constitutional due process requirements. 494 U.S. at 236. The policy entitled an inmate who refused to take medication, which a psychiatrist determined necessary, to a hearing before a special committee consisting of a psychiatrist, a psychologist, and the associate superintendent of the special offender center. *Harper*, 494 U.S. at 215. The inmate also had additional procedural rights surrounding the hearing, including the right to be informed of the tentative diagnosis, the factual basis for the diagnosis, and why the staff believed the medication to be necessary. *Harper*, 494 U.S. at 216.

Following *Harper*, our legislature amended former RCW 71.05.215, which addresses a person's right to refuse antipsychotic medication and instructs the Health Care Authority (HCA) to adopt rules to carry out the purposes of the chapter. *See* former RCW 71.05.215 (1997). The amendment included a requirement that the HCA's rules include "[a]n attempt to obtain the informed consent of the person prior to administration of antipsychotic medication." Former RCW 71.05.215(2)(a). Former RCW 71.05.215(2)(e) also required that the HCA's rules include "documentation in the medical record of the attempt by the physician, physician assistant, or psychiatric advanced registered nurse practitioner to obtain informed consent and the reasons why antipsychotic medication is being administered over the person's objection or lack of consent."

Under former RCW 71.05.217(7)(a), a court may order the involuntary administration of antipsychotic medication if a petitioning party proves by clear, cogent, and convincing evidence that a compelling State interest exists to justify overriding the patient's lack of consent, the proposed treatment is necessary and effective, and no medically acceptable alternative forms of treatment are available. Former RCW 71.05.217(7)(b) also requires that the superior court make specific findings of fact regarding "the person's desires regarding the proposed treatment. If the patient is unable to make a rational and informed decision about consenting to or refusing the proposed treatment, the court shall make a substituted judgment for the patient as if he or she were competent to make such a determination."

## II. MOOTNESS AND STANDARD OF REVIEW

As an initial matter, although LK's order has expired, this case is not moot because an order to involuntarily administer antipsychotic medication as part of LK's prior medical history may have collateral consequences in future proceedings. *In re Det. of B.M.*, 7 Wn. App. 2d 70, 76, 432 P.3d 459, *review denied*, 193 Wn.2d 1017 (2019).

"On revision, the superior court reviews the commissioner's findings of fact and conclusions of law de novo based on the evidence and issues presented to the commissioner." *Winter v. Dep't of Social & Health Serv.*, 12 Wn. App. 2d 815, 829, 460 P.3d 667 (2020). "Under RCW 2.24.050, the findings and orders of a court commissioner not successfully revised become the orders and findings of the superior court." *Maldonado v. Maldonado*, 197 Wn. App. 779, 789, 391 P.3d 546 (2017). We review the superior court's ruling, not the commissioner's decision. *See Flaggard v. Hocking*, 13 Wn. App. 2d 252, 259, 463 P.3d 775 (2020). "When the

standard is 'clear, cogent, and convincing . . . the findings must be supported by substantial evidence in light of the 'highly probable' test.'" *B.M.*, 7 Wn. App. 2d at 85 (quoting *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986)). That is to say, "the ultimate fact in issue must be shown by evidence to be 'highly probable.'" *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831(1973).

### III. AN ATTEMPT TO OBTAIN INFORMED CONSENT IS MANDATORY

LK argues that former RCW 71.05.215 and .217, read together, make mandatory the attempt to obtain informed consent to administer antipsychotic medication. We agree.

We review issues of statutory interpretation de novo. *State v. C.B.*, 165 Wn. App. 88, 95, 265 P.3d 951 (2011). "Our primary objective when interpreting a statute is to ascertain and give effect to the legislature's intent." *C.B.*, 165 Wn. App. at 95. To do this, we begin by examining the statute's plain language and according it its ordinary meaning. *C.B.*, 165 Wn. App. at 95. Statutes that relate to the same subject matter are to be construed together as constituting a unified whole. *Hallauer v. Spectrum Properties, Inc.*, 143 Wn.2d 126, 146, 18 P.3d 540 (2001). "'Statutes must be interpreted and construed so that all the language used is given effect, with no portion rendered meaningless or superfluous.'" *G-P Gypsum Corp. v. Dep't of Revenue*, 169 Wn.2d 304, 309 237 P.3d 256 (2010) (internal quotation marks omitted) (quoting *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003)).

Former RCW 71.05.215(1) provides:

> A person found to be gravely disabled or presents a likelihood of serious harm as a result of a mental disorder or substance use disorder has a right to refuse antipsychotic medication unless it is determined that the failure to medicate may result in a likelihood of serious harm or substantial deterioration or substantially

7

prolong the length of involuntary commitment and there is no less intrusive course of treatment than medication in the best interest of that person.

To safeguard that right while balancing potential compelling State interests in treating such patients, former RCW 71.05.215(2) mandates the establishment of specific rules and states that these rules *shall* include "[a]n attempt to obtain the informed consent of the person prior to administration of antipsychotic medication." In addition, former RCW 71.05.217(7)(b) requires that the superior court make findings about "the person's desires regarding the proposed treatment" before authorizing the involuntary administration of medication. It is axiomatic that a requirement to make such findings necessarily requires an attempt to obtain informed consent from the patient regarding the proposed medication.

The State argues that the order here is valid because any attempt to obtain LK's informed consent would have been futile. The State contends that the requirement to make an attempt to obtain informed consent is satisfied when the treating physician determines that an attempt would be futile because the patient lacks the competency to give informed consent.[2] But neither the statutes nor due process principles permit any such nullification of a patient's right to refuse antipsychotic medication.

Neither former RCW 71.05.215 nor former RCW 71.05.217 provides that medical professionals may substitute their judgment for the procedures established by law to protect a person's substantial liberty interest in refusing antipsychotic medication. Former RCW

---

[2] At oral argument, the State clarified that it was not arguing that it had to prove the respondent was *legally* incompetent, but instead that the court should rely on a physician's medical judgment that the respondent would be unable to engage in a meaningful discussion regarding their preference. Wash. Court of Appeals oral argument, *In re Det. of LK*, No. 53377-4-II (July 1, 2020), at 11 min., 25 sec. through 12 min., 26 sec. (on file with court).

71.05.217(7)'s high burden for obtaining an order authorizing involuntary administration of medication contains no exception for patients a doctor determines is incompetent. Rather, the plain language of the statutes, read together, clearly mandates that the State attempt to obtain informed consent from all patients before seeking authorization for involuntary treatment.

The State also contends that federal courts permit such a nullification, but its argument is unpersuasive. The State first cites *Youngberg v. Romeo*, 457 U.S. 307, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982) (plurality opinion). But *Youngberg* did not involve the involuntary administration of antipsychotic medication. *Youngberg* involved a civil action for damages wherein a mentally disabled man in a state institution alleged that the State had violated his substantive due process rights to safe conditions of confinement, freedom from bodily restraints, and training or "habilitation." The case addressed the proper standard of liability in such cases. 457 U.S. at 325. The Supreme Court held that in determining whether the State had adequately protected a person's rights, courts must show deference to the judgment exercised by a qualified professional, particularly when it came to a determination of what constitutes reasonable training. 457 U.S. at 324-25. Thus, *Youngberg* is not instructive here.

The State next cites *Rennie v. Klein*, 720 F.2d 266, 269 (3d Cir. 1983) (plurality opinion), for the premise that "antipsychotic drugs may be constitutionally administered to an involuntarily committed mentally ill patient whenever, in the exercise of professional judgment, such an action is deemed necessary to prevent the patient from endangering himself or others." However, *Rennie*'s emphasis on deference to medical professional judgment was in regard to weighing the evidence of whether a patient constitutes a danger to themselves or to others when determining

9

whether involuntary treatment is appropriate. *See* 720 F.2d 266 at 269. *Rennie* does not stand

for the premise that a single medical professional's determination of an involuntarily committed

patient's inability to consent fulfills a statutory obligation to attempt to obtain informed consent

sufficient to administer psychotropic medications. *See also Harper*, 494 U.S. at 233 (noting that

adequate procedural safeguards existed where the independence of the decision-maker was

addressed by barring the inmate's current physician(s) from serving on the hearing committee).

The State argues that LK's interpretation of former RCW 71.05.215 and former RCW

71.05.217 elevates form over substance by requiring a "formulaic statement of the benefits and

risks of the specific antipsychotic medications followed by a request for consent, which must be

provided even if the patient has no ability to comprehend the information." Br. of Resp't at 12.

On the contrary, the State's contention that it need not discuss the proposed treatment with a

patient in an attempt to obtain informed consent so long as the treating physician determines

such an attempt would be futile would render former RCW 71.05.215(2)(a) meaningless. We

interpret statutes so that no portion is rendered meaningless or superfluous. *G-P Gypsum*, 169

Wn.2d at 309.[3]

A physician must attempt to obtain informed consent before seeking an order authorizing

involuntary administration of antipsychotic medication. We hold that a treating psychiatrist's

opinion that a patient is unable to give consent, formed before having any discussion with that

---

[3] Although we reject the State's interpretation of the statute, even if we agreed with the State, the facts in this case would mandate reversal. The State cannot reconcile its argument that LK was incapable of giving informed consent while simultaneously obtaining her consent to continue her course of treatment 24 hours prior to her hearing.

patient about the proposed treatment, is insufficient to satisfy the statutory requirement of attempting to obtain informed consent, and cannot, without more, form the basis of a superior court's finding that the State sufficiently attempted to obtain informed consent.

## IV. THE SUPERIOR COURT'S ORDER WAS UNLAWFUL

LK argues that because the State failed to attempt to obtain her informed consent, the superior court erred by granting the authorization for involuntary treatment. We agree.

As discussed above, former RCW 71.05.215(2)(a) and former RCW 71.05.217(7)(b) clearly require the State to attempt to obtain informed consent before involuntarily administering psychotropic medications. The State's failure to attempt to obtain LK's informed consent renders the order in this case unlawful. This result is further supported by *Harper*, 494 U.S. at 221. In *Harper*, the Court explicitly held that the Due Process clause of the Fourteenth Amendment requires certain essential procedural protections before the involuntary administration of medications to prisoners. 494 U.S. at 228. The Court went on to hold that a written State policy addressing such involuntary medication "undoubtedly confers upon respondent a right to be free from the arbitrary administration of antipsychotic medication," and that the policy created an expectation on the part of the prisoners that drugs would not be administered in violation of the policy. *Harper*, 494 U.S. at 221. Such is the situation here.

In addition to the significant liberty interest every person maintains in avoiding the unwanted administration of antipsychotic medication under the federal due process clause, the mandatory nature of former RCW 71.05.215(2)(a) and former RCW 71.05.217(7)(b) create a protected liberty interest in avoiding involuntary treatment without an attempt to obtain informed

11

consent. *See Harper*, 494 U.S. at 221. Former RCW 71.05.215(2)(a) and former RCW 71.05.217(7)(b) create a justifiable expectation on the part of involuntarily committed persons that antipsychotic medication will not be administered unless an attempt to obtain their informed consent has been made.

Here, the State never attempted to obtain LK's informed consent to the proposed treatment. Although the superior court found that LK refused to consent to treatment, all evidence regarding LK's refusal to be medicated was specific to LK's comments about her prior treatment with Clorazil. But the State was not seeking authorization for treatment with Clorazil. And former RCW 71.05.217(7)(b) expressly requires findings about *the proposed* treatment. *See In re Det. of Strand*, 167 Wn.2d 180, 188-89, 217 P.3d 1159 (2009) (statutory reference to "a current" evaluation was broader and more indeterminate than "the current" evaluation, thereby allowing for a future evaluation to be considered). Dr. Raghunath testified that no discussions regarding the proposed treatment with Risperdal or fluphenazine had occurred with LK.

The evidence shows that the State failed to fulfill its mandatory duty to seek LK's informed consent. This failure violated former RCW 71.05.215(2)(a), former RCW 71.05.217(7)(b), and LK's right to due process. Accordingly, the commissioner's order authorizing the involuntary administration of antipsychotic medication was unlawful, and the superior court erred by not granting LK's motion to revise.

CONCLUSION

In conclusion, the State must attempt to obtain informed consent for the proposed treatment before seeking an order authorizing involuntary administration of antipsychotic

medication. A treating psychiatrist's opinion that a patient is unable to give consent, formed before having any discussion with that patient about the proposed treatment, is insufficient to satisfy the mandatory statutory requirement of attempting to obtain informed consent. This failure to attempt to obtain informed consent violated former RCW 71.05.215(2)(a), former RCW 71.05.217(7)(b), and LK's due process rights. Accordingly, the commissioner's order authorizing the involuntary administration of antipsychotic medication was unlawful, and the superior court erred by not granting LK's motion to revise.

We reverse and remand to the superior court to vacate the order authorizing involuntary administration of antipsychotic medication.

_____
Worswick, J.

I concur:

_____
Sutton, A.C.J.

MELNICK, J. (concurring) — I concur with the majority's result. I write separately because I believe the majority's holding is overbroad.

Washington's involuntary commitment laws require the State to adopt rules that "shall include . . . [a]n attempt to obtain the informed consent of the person prior to administration of antipsychotic medication." RCW 71.05.215(2)(a). At the time of LK's case, WAC 246-341-1124(1)(a) applied and it required "[a]n attempt to obtain informed consent." Consent is defined as:

> [An] agreement given by an individual after the person is provided with a description of the nature, character, anticipated results of proposed treatments and the recognized serious possible risks, complications, and anticipated benefits, including alternatives and nontreatment, that must be provided in a terminology that the person can reasonably be expected to understand.

WAC 246-341-0200.

In the present case, the day before LK's involuntary commitment hearing, the State obtained LK's consent to remain under her currently prescribed medications. The notice stated that LK had been informed and understood she had a hearing set for the next day.

At the hearing, the physician testified that no discussion with LK occurred about the new proposed treatment. The presiding superior court commissioner found that LK refused consent and could be involuntarily treated with the new medication. A superior court judge denied LK's motion to revise. He opined that an attempt to obtain informed consent was "an exercise in futility." Report of Proceedings (Mar. 22, 2019) at 20.

In this case, the failure to attempt to obtain informed consent would not have been futile. In fact, the State obtained LK's consent to continue her medications the day before the hearing.

14

The facts do not support the State's argument that any attempt to obtain informed consent would have been futile in this case. Rather, the facts demonstrate the opposite.

However, I disagree with the majority that the failure to attempt to obtain informed consent is a due process violation. It is merely a statutory or rule violation.[4] We should refrain from deciding a case on constitutional grounds unless it is absolutely necessary. *Isla Verde Int'l Holdings, Inc. v. City of Camas*, 146 Wn.2d 740, 752, 49 P.3d 867 (2002), *abrogated on other grounds by Yim v. City of Seattle*, 194 Wn.2d 682, 451 P.3d 694 (2019).

I also disagree with the majority's treatment of the statute's interpretation on futility. First, we are not presented with that situation in this case and we should not decide the issue. *Ruse v. Dep't of Labor & Indus.*, 138 Wn.2d 1, 8-9, 977 P.2d 570 (1999). Second, there may be situations not present here, where an attempt to obtain informed consent may be a futile gesture. As an example, RCW 10.31.040, known colloquially as the knock and announce statute, states that an officer may break open the doors or windows of a residence or building "if, after notice of his or her office and purpose, he or she be refused admittance." Although there are no statutory exceptions, it is well-settled that "useless gestures" excuse compliance with RCW 10.31.040. *State v. Coyle*, 95 Wn.2d 1, 11, 621 P.2d 1256 (1980); *State v. Shelly*, 58 Wn. App. 908, 911, 795 P.2d 187 (1990).

---

[4] LK argues that due process requires an attempt to obtain informed consent from an involuntarily committed person before antipsychotic medications are administered. LK relies on *Washington v. Harper*, 494 U.S. 210, 110 S. Ct 1028, 108 L. Ed. 2d 178 (1990); however, *Harper* does not stand for that proposition. *Harper*'s holding is that an administrative hearing, and not a judicial hearing, is required before a person can be treated with antipsychotic drugs against the person's will. *Harper*, 494 U.S. at 231.

Similar to knock and announce cases, I can envision situations where a "futile action" may excuse compliance with a doctor attempting to obtain informed consent.  I would speculate that any such exception would be narrowly drawn.  However, this issue is not before us in this case and I believe the majority's holding is overbroad.  I respectfully concur.

_____
Melnick, J.