# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| In the Matter of the Detention of<br><br>A.M.,<br><br><br>       Appellant. | No. 53965-9-II<br><br><br>ORDER GRANTING MOTION TO PUBLISH AND PUBLISHING OPINION |

Appellant A.M. filed a motion to publish this court's opinion filed on April 27, 2021. After consideration, the court grants the motion. It is now

**ORDERED** that the final paragraph in the opinion which reads "A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered." is deleted. It is further

**ORDERED** that the opinion will now be published.

**PANEL:** Jj. Maxa, Cruser, Veljacic

**FOR THE COURT:**

_____
CRUSER, J.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| In the Matter of the Detention of | No. 53965-9-II |
| A.M., | |
| Appellant. | UNPUBLISHED OPINION |

CRUSER, J. – AM appeals from the superior court order imposing 180 days of involuntary mental health treatment based on findings that AM (1) had committed acts constituting a felony and presents a substantial likelihood of repeating similar acts, and (2) continued to be gravely disabled. AM argues that the evidence was insufficient to establish that (1) he had committed an act constituting the crime of felony harassment, and (2) he was gravely disabled.[1]

We hold that (1) the evidence was sufficient to establish that AM committed an act constituting felony harassment, and (2) although the evidence was insufficient to support a finding that AM was gravely disabled under former RCW 71.05.020(22)(a) (2018), the evidence was sufficient to support a gravely disabled finding under former RCW 71.05.020(22)(b). Accordingly,

---

[1] Appeals involving involuntary commitments are not moot because prior involuntary commitment orders have potential collateral consequences. *In re Det. of B.M.*, 7 Wn. App. 2d 70, 76-77, 432 P.3d 459, *review denied*, 193 Wn.2d 1017, 444 P.3d 1185 (2019). Accordingly, we address this appeal even though the 180-day involuntary treatment period has expired.

we affirm in part and reverse in part and remand for the superior court to strike the gravely disabled finding under former RCW 71.05.020(22)(a).

## FACTS

### I. CHARGES AND DISMISSAL OF CHARGES

AM was arrested after telling a grocery checker that he was "going to get a gun and shoot [her] in the face." Sealed Clerk's Papers (CP) at 42. The State charged AM with felony harassment.

When AM was deemed incompetent to stand trial and his competency was not restored after a period of treatment, the criminal court dismissed the charge without prejudice. The criminal court also committed AM to Western State Hospital for up to 72 hours to allow for an evaluation to determine if AM should be subject to civil commitment for involuntary mental health treatment under chapter 71.05 RCW.

### II. PETITION FOR 180-DAY INVOLUNTARY TREATMENT AND HEARING

A. PETITION

AM's treatment providers (Petitioners) subsequently petitioned for an additional 180 days of involuntary treatment under former RCW 71.05.280(3) and (4) (2018).[2] The Petitioners alleged that, as a result of a mental disorder, AM was "gravely disabled," and that he had "been determined to be incompetent and criminal charges [had] been dismissed pursuant to RCW 10.77.086(4),[3]

---

[2] This petition was filed on June 28, 2019.

[3] The legislature amended RCW 10.77.086 in 2019, but because the amendments did not change subsection (4), we cite to the current version of the statute. Laws of 2019, ch. 326 § 4.

3

ha[d] committed acts constituting a felony[, Felony Harassment], and as a result of a mental disorder, presents a substantial likelihood of repeating similar acts."[4] CP at 2.

B. HEARING TESTIMONY

The petition was heard by a superior court commissioner. The checker, the psychologist who had evaluated AM, and AM testified at the hearing.

1. THE CHECKER'S TESTIMONY

The checker testified that on March 1, 2018, at about 7:45 PM, she was working the night shift at the grocery store when she attempted to check out AM's purchases. When she asked AM, whom she had never seen before, if he had a discount card or if he would provide his phone number in order to save some money, AM responded that she didn't "deserve to know [his] phone number." *Id.* at 42. The checker initially "kind of brushed it off" as "[n]o big deal," but AM then "lean[ed] all the way over the monitor" and said, "I'm going to get a gun and shoot you in the face." *Id.*

The checker testified that at first she was "[t]aken aback" and "moderately scared." *Id.* She asked AM if he had just "threaten[ed] [her] with physical violence," and he responded that he had. *Id.* at 43. The checker "immediately called [her] manager over the intercom." *Id.* at 44. The manager responded right away and told AM to leave the store and not return. AM left the store.

After the checker attended to the next customer, she "started shaking." *Id.* The checker testified that that she then went home because she "was not going to stay for [her] entire shift," which ended at 3:30 AM. *Id.*

---

[4] The petition also stated that AM had been charged with second degree malicious mischief. But the 180-day involuntary commitment order was not based on the second degree malicious mischief charge, so we do not discuss that charge.

When the Petitioners' counsel asked the checker how she felt immediately after the incident, she responded, "Upset. I've never been talked to that way." *Id.* And when counsel asked her if she "fear[ed] for [her] safety," she responded, "Definitely." *Id.*

2. DR. TOMEI'S TESTIMONY

Next, Dr. Jenna Tomei, a licensed clinical psychologist, testified. Dr. Tomei testified that she had evaluated AM. In preparation for the evaluation, she had attempted to interview AM, reviewed any "available discovery information," reviewed prior forensic reports from two other doctors, reviewed AM's medical chart, consulted AM's treatment team, and observed AM "on several occasions." *Id.* at 47.

Dr. Tomei diagnosed AM with "unspecified schizophrenia spectrum and other psychotic disorder." *Id.* at 48. She testified that AM's mental health disorders caused him to "present[ ] with disorganized and perseverative thought processes," to "present[ ] with delusional ideation" related to paranoia involving beliefs that people in the hospital were trying to kill him and to "somatic complaints," and to display "mood lability and agitation and anger." *Id.* AM "also presented with impaired judgment and insight," some memory issues, and an inability to "remain[ ] focused and attentive." *Id.*

Dr. Tomei further testified that AM's "disorder interfere[d] with his ability to provide for his basic health and safety needs." *Id.* As an example, Dr. Tomei stated that AM currently believed that he had "some sort of intestinal problem" that was not "supported in the records," and that as a result of this belief he had been eating only intermittently from the end of June up to this July 15 hearing. *Id.* at 49. She further stated that when she met with AM, "he presented as very disheveled, and unkempt." *Id.* She opined that AM needed "to be in a structured" or "secure environment" that

provided him with assistance in order to meet his basic health and safety needs and activities of daily living (ADLs). *Id.*

When Petitioners' counsel asked Dr. Tomei if AM "present[ed] a likelihood of repeating acts similar to those he's been accused of at the hearing today," she responded that he did . *Id.* at 50. She stated that she came to that conclusion because, since his admission, AM had been "presenting in a very similar fashion to how he presented during the time of the incident. Specifically, he ha[d] been consistently noted to be very agitated and angry on the ward, as well as voicing paranoid delusional beliefs that seem to be driving that agitation." *Id.* Dr. Tomei opined that if AM were released, his behaviors would continue. But Dr. Tomei admitted that AM had not exhibited any assaultive behavior or made any threats to kill during his current hospitalization.

Dr. Tomei further noted that AM had no insight into his mental illness, that he did not believe he was mentally ill or in need of medication, that he was not currently taking any medication, and that he had "a history of noncompliance with medication in the community." *Id.* at 50. Dr. Tomei also stated that AM had prior admissions in other facilities in 2006, 2017, and January through February 2018. It appeared, however, that only the 2006 admission was involuntary.

Additionally, Dr. Tomei testified that she had been unable to determine whether AM could "describe[ ] a discharge plan," because AM had discontinued his interview with her "after only a few minutes." *Id.* at 53. She stated that during the interview, AM had "continued to perseverate on his . . . criminal charges being dismissed," that he became increasingly "agitated" during the interview, and that he "stormed out and slammed the door when he was informed that [his criminal

charges had been] dismissed without prejudice." *Id.* His treatment team had also been unable to obtain any information from AM regarding a release plan.

### 3. AM's Testimony

AM testified that he received "Social Security Disability" and that when he was released he planned to stay at "the Bread of Life" in Seattle where he could get a bed for $5 a night. *Id.* at 60-61. He also testified that he had Medicare, that he had used it before, and that he would seek out a doctor in Seattle if he were to get sick. He stated that would also be able to buy a bus pass and access transportation should he need medical care. He further stated that he had "a Y card" and would have access to the facility near "the homeless shelter." *Id.* at 62.

## C. Commissioner's Ruling and Motion for Revision

After hearing the testimony, the commissioner orally found that the Petitioners had established grave disability under prong (a) and (b) of former RCW 71.05.020(22). The commissioner also found that AM's statement to the checker that he was going to get a gun and shoot her in the face established that AM had made "a threat." *Id.* at 66. The commissioner stated that the checker "obviously indicated that" this statement "frightened her," and that there was evidence of felony harassment. *Id.* at 67. The commissioner also found that there was also "evidence that [AM] would commit similar acts" at that time. *Id.*

In his written order, which expressly incorporated his oral findings, the commissioner found:

> [AM] was determined to be incompetent and felony charges were dismissed. [AM] committed the following acts[:] [T]hreatened to shoot victim in the face, which constitutes a threat to kill, which constitute[s] the felony . . . of felony harassment

pursuant to RCW 9A.46.020(2)(b)(ii)[5] within the meaning of RCW 71.05, and as a result of a mental disorder, [AM] presents a substantial likelihood of repeating similar acts.

*Id.* at 23.

The commissioner also found that the Petitioners had shown that (1) "as a result of a mental disorder [AM] is in danger of serious physical harm resulting from the failure to provide for his . . . essential needs of health or safety," and (2) "as a result of a mental disorder [AM] manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over actions, [and] is not receiving such care as is essential for health and safety." *Id.* at 24. The commissioner concluded that AM (1) "present[ed]/continue[d] to present a substantial likelihood of repeating acts similar to the charged criminal behavior," and (2) was or continued to be gravely disabled. *Id.* The commissioner granted the petition and ordered up to 180 days of additional intensive inpatient treatment.

AM moved to revise the commissioner's decision. The superior court denied the motion for revision. AM appeals.

---

[5] RCW 9A.46.020 provides, in part:
> (1) A person is guilty of harassment if:
> (a) Without lawful authority, the person knowingly threatens:
> (i) To cause bodily injury immediately or in the future to the person threatened or to any other person; or
>  . . . ; and
> (b) The person by words or conduct places the person threatened in reasonable fear that the threat will be carried out. . . .
> (2) . . . .
> (b) A person who harasses another is guilty of a class C felony if any of the following apply: . . . (ii) the person harasses another person under subsection (1)(a)(i) of this section by threatening to kill the person threatened or any other person.

ANALYSIS

AM argues that the evidence was insufficient to establish that (1) he had committed an act constituting a felony, and (2) he was gravely disabled. We hold that (1) the evidence was sufficient to establish that AM committed an act constituting felony harassment, and (2) although the evidence was insufficient to support a finding that AM was gravely disabled under former RCW 71.05.020(22)(a), the evidence was sufficient to support a gravely disabled finding under former RCW 71.05.020(22)(b).

I. LEGAL PRINCIPLES

Following a denial of a motion to revise a commissioner's ruling, we "review the superior court's ruling, not the commissioner's decision." *In re Det. of L.K.*, 14 Wn. App. 2d 542, 550, 471 P.3d 975 (2020). When the superior court denies a motion to revise the commissioner's ruling, the commissioner's decision becomes the superior court's decision. *Id*.

The Petitioners' burden of proof in a 180-day involuntary commitment proceeding is by clear, cogent, and convincing evidence. *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). The clear, cogent, and convincing evidence standard is met when "the findings [are] supported by substantial evidence in light of the 'highly probable' test." *Id*. Under the highly probable test, "the ultimate fact in issue must be shown by evidence to be 'highly probable.'" *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973). "Substantial evidence is the quantum of evidence sufficient to persuade a rational fair-minded person" that the premise is true. *In re Det. of H.N.*, 188 Wn. App. 744, 762, 355 P.3d 294 (2015). Furthermore, when evaluating the sufficiency of the evidence, we consider the evidence in the light most favorable to the Petitioners. *In re Det. of B.M.*, 7 Wn. App. 2d 70, 85, 432 P.3d 459, *review denied*, 193 Wn.2d 1017 (2019).

## II. ACTS CONSTITUTING A FELONY

AM first argues that the evidence was insufficient to support the finding that he had committed acts that constituted felony harassment because there was no evidence that the checker was placed in fear of him carrying out his threat to kill rather than merely attempting to inflict a lesser harm.[6] We disagree and hold that the evidence as a whole, taken in the light most favorable to the Petitioners, was sufficient to persuade a rational fact finder that it was highly probable that the checker feared AM would carry out his threat to kill her.

To commit AM under former RCW 71.05.280(3), the trial court had to find by clear, cogent, and convincing evidence that AM had "committed acts constituting a felony." *State v. M.R.C.*, 98 Wn. App. 52, 57, 989 P.2d 93 (1999). To prove felony harassment based on a threat to kill, the Petitioners had to establish "that the person threatened was placed in reasonable fear that the threat to kill would be carried out." *State v. C.G.*, 150 Wn.2d 604, 612, 80 P.3d 594 (2003).

The evidence here, taken in the light most favorable to the Petitioners, supports the conclusion that it was highly probable that the checker feared AM would carry out his threat to return and kill her. Although AM is correct that the checker's initial reaction was to contact her supervisor, rather than to flee or attempt to hide, the checker's response was reasonable even if she believed that AM would follow through on his threat to kill because he threatened to shoot her in the future, not immediately. And the checker's testimony that she was initially only "moderately scared," must be considered in conjunction with her later response to the threat. CP at 42. The checker also testified that, after a short time, she became "[u]pset," that she feared for her safety

---

[6] The parties do not dispute that threatening to shoot someone is the face is a threat to kill. And AM does not challenge the finding that "as the result of a mental disorder, [AM] present[ed] a substantial likelihood of repeating similar acts." CP at 23.

to the point she started shaking, that she was unable to complete her shift, and that she left the store soon after the incident and several hours before her shift was over. *Id.* at 44. Additionally, there was no evidence suggesting that AM made any lesser threat or that the checker knew anything about AM that would allow her to conclude he was unlikely to carry out his actual threat. These facts demonstrate that it was highly probable that the checker feared that AM would return and carry out his threat to kill her.

This case can be distinguished *C.G.*, the case upon which AM relies. In *C.G.*, our Supreme Court concluded that the victim's testimony that the defendant's threat to kill him "caused him concern" and that based on his personal knowledge of the defendant "she might try to *harm* him," did not establish that the victim feared that the defendant would carry out her threat to kill him. 150 Wn.2d at 607 (emphasis added). But *C.G.* was a criminal case in which the State was required to prove this element beyond a reasonable doubt, not by clear, cogent, and convincing evidence, the standard that applies here. And the victim in *C.G.* had personal knowledge of the defendant from which he could judge the veracity of the threat; no such knowledge was available to the victim here. Based on the more stringent burden of proof and the additional evidence of the victim's knowledge of the defendant, *C.G.* is not instructive here.

Because the evidence, taken in the light most favorable to the Petitioners, demonstrates that it is highly probable that the checker feared that AM would carry out his threat to kill, there was sufficient evidence to support the trial court's finding that AM had committed an act constituting a felony. Accordingly, this argument fails.

III. GRAVE DISABILITY FINDINGS

The superior court found AM gravely disabled under prongs (a) and (b) of former RCW 71.05.020(22), which provided:

> "Gravely disabled" means a condition in which a person, as a result of a mental disorder,[7] . . . : (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

Former RCW 71.05.020(22).

AM argues that the evidence does not support either of the court's grave disability findings. We agree that the evidence does not support the finding under prong (a), but we hold that it does support the finding under prong (b).

A. FAILURE TO PROVIDE FOR ESSENTIAL HUMAN NEEDS

To establish "grave disability" under prong (a), the Petitioners had to produce "recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment." *LaBelle*, 107 Wn.2d at 204-05. The Petitioners must also produce evidence that these deficiencies placed AM in danger of serious physical harm. Former RCW 71.05.020(22)(a).

The unrebutted evidence at the hearing was that AM believed he had "some sort of intestinal problem" that was not "supported in the records," and that, as a result of this belief, he had been refusing to eat and had been eating only intermittently from the end of June up to this July 15 hearing. CP at 49. And Dr. Tomei testified that AM needed "to be in a structured" or

---

[7] AM does not dispute that any failure to provide for his essential human needs or severe deterioration in routine functioning were the result of a mental disorder.

"secure environment" that provided him with assistance in order to meet his basic health and safety need and ADLs. *Id.* Although AM might have been able to articulate that he would be able to find shelter and medical care if released, and he was clearly able to attempt to purchase groceries before his arrest, nothing in the record contradicts the evidence that AM would stop or severely limit his eating based on delusional beliefs regarding non-existent health issues. Based on these facts, the Petitioners produced "recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment." *LaBelle*, 107 Wn.2d at 204-05.

But prong (a) requires that the Petitioners also establish that the failure to meet these needs placed AM "in danger of serious physical harm." Former RCW 71.05.020(22)(a). AM is correct that the record is devoid of any such evidence. The only evidence in the record of potential harm is Dr. Tomei's conclusory statements that AM could not meet his basic health and safety needs or conduct his ADL's outside of a secured environment. There was no evidence of past or recent weight loss or any other health consequence from AM's reluctance to eat or any inability to meet his ADLs.

*LaBelle* is instructive here. In *LaBelle*, our supreme court addressed several involuntary commitments under prong (a). One of the appellants, Richardson, had a history of "not eating well before he was hospitalized." *LaBelle*, 107 Wn.2d at 214. But our supreme court held that the continued commitment was not supported by the evidence in part because "there was no evidence that he was in any danger" from "not eating well." *Id.* The court held that "[u]nder these circumstances, the risk of physical harm from Richardson's tendency to neglect his health was too speculative and insubstantial to justify continued commitment" under prong (a). *Id.* In contrast, the court held that there had been sufficient evidence to support another appellant's commitment

because there was evidence that the appellant, Trueblood, was not eating and that he "was noticeably losing weight." *Id.* These holdings demonstrate that to establish grave disability under prong (a) there needs to be evidence not only of a failure to provide for nutritional needs, but also that this deficiency was or could be harmful to the appellant.

Because the record here is devoid of any evidence that AM's reluctance to eat was or could be harmful to AM, we agree that the finding that he was gravely disabled under prong (a) is not supported by the evidence.

## B. SEVERE DETERIORATION IN ROUTINE FUNCTIONING

Prong (b) represents a legislative attempt to permit "intervention before a mentally ill person's condition reaches crisis proportions," as it "enables the State to provide the kind of continuous care and treatment that could break the cycle and restore the individual to satisfactory functioning." *LaBelle*, 1007 Wn.2d at 206. To establish "grave disability" under this prong, the Petitioners had to produce evidence of (1) severe deterioration in routine functioning as evidenced by "recent proof of significant loss of cognitive or volitional control," and (2) "a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety." *Id.* at 208. "Implicit in the definition of gravely disabled . . . is a requirement that the individual is unable, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment." *Id.* (emphasis omitted).

The record demonstrates that the Petitioners presented sufficient evidence of severe deterioration in routine functioning as evidenced by recent proof of significant loss of cognitive or volitional control—specifically, AM's recent felony harassment of a stranger due to his (AM's)

delusional beliefs and AM's recent avoidance of food based on his delusional belief that he suffered from health issues. AM also remained "very agitated and angry on the ward" due to "paranoid delusional beliefs." CP at 50. AM's recent criminal act, his health concerns that impacted his ability to feed himself, and his continuing agitated and angry state, which were all due to his persistent delusional beliefs, demonstrate deterioration in routine functioning as evidence by recent significant loss of cognitive or volitional control.

Additionally, the record provides ample support from which the superior court could find that AM would not receive care that is essential for his health or safety if released and that AM was incapable of making rational decisions about his health care needs. Dr. Tomei testified that AM had no insight into his mental illness, did not believe that he was mentally ill, and did not believe that he needed any medication. She also testified that he had "a history of noncompliance with medication in the community." *Id.* And she testified that AM had three prior admissions for mental health treatment.

The above facts provided substantial evidence of grave disability under prong (b) that the superior court could have reasonable found to be clear, cogent, and convincing.

## CONCLUSION

We hold that (1) the evidence was sufficient to establish that AM committed an act constituting felony harassment, and (2) although the evidence was insufficient to support a finding that AM was gravely disabled under former RCW 71.05.020(22)(a), the evidence was sufficient to support a gravely disabled finding under former RCW 71.05.020(22)(b). Accordingly, we affirm in part and reverse in part and remand for superior court to strike the gravely disabled finding under former RCW 71.05.020(22)(a).

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, J.

We concur:

MAXA, P.J.

VELJACIC, J.