# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of:<br><br>J.D.<br><br>       Petitioner. | No. 57433-1-II<br><br><br><br>UNPUBLISHED OPINION |

  VELJACIC, J. — J.D. appeals a superior court order denying his motion to revise a commissioner's decision to commit him to up to 14 days of involuntary treatment.[1] J.D. argues that substantial evidence does not support the court's finding of fact that J.D. was not medically stable and the findings of fact do not support the court's conclusion of law that J.D. was gravely disabled under former RCW 71.05.020(24)(b) (2022).[2]

  We hold that substantial evidence supports the superior court's finding that J.D. was medically unstable and the court's conclusion that J.D. was gravely disabled. Accordingly, we affirm the superior court's order denying revision of the involuntary commitment order.

## FACTS

  J.D. visited the emergency room on multiple occasions due to injuries from "thinking [that] people were after him." Clerk's Papers (CP) at 25. J.D. was "fixated" on thinking people were "following him." CP at 25. After being treated in the emergency room, J.D. was evaluated by Dr.

---

[1] Both parties agree that although the 14-day commitment order has long-since expired, this appeal is not moot. *See In re Det. of M.K.*, 168 Wn. App. 621, 626, 279 P.3d 897 (2012) (expiration of a commitment order does not render an appeal moot because there are collateral consequences from the order, such as the consideration of the commitment order at future commitment hearings).

[2] *See* LAWS OF 2022 ch. 210 § 1.

Bethany O'Neill, a mental health expert, and Robert Garrard, the examining physician. Both doctors petitioned for a 14-day involuntary commitment.

At the 14-day involuntary commitment hearing, Dr. O'Neill testified to the delusional thoughts that J.D. experienced. J.D. described them as "an ongoing thing." CP at 68. Dr. O'Neill testified to an incident where J.D. ran down an embankment into water and had to be rescued by the United States Coast Guard.

Dr. O'Neill also described how J.D.'s persistent delusions affected other areas of his life. For example, while J.D. appeared cooperative during his examinations, he became upset and paranoid whenever Dr. O'Neill conducted reality testing. J.D. also appeared confused "about why he's in the hospital." CP at 70. While J.D.'s memory seemed intact when describing events like running into the water, Dr. O'Neill opined that J.D.'s memory was also impacted by his delusional thoughts. Moreover, while J.D.'s speech and ability to communicate appeared clear, J.D. experienced latency and the content of his speech remained fixated on his delusional thoughts.

Dr. O'Neill testified that J.D.'s delusional thoughts interfered with his judgement and insight. She explained that J.D. consistently refused medications, "sometimes in anger" because he "[d]oesn't think he needs it. Doesn't understand it's a mental health issue." CP at 71. Dr. O'Neill also testified to J.D.'s methamphetamine use. Dr. O'Neill opined that J.D.'s symptoms were inconsistent with being solely caused by methamphetamine use because even after detoxing from methamphetamine, J.D.'s delusional thoughts continued.

J.D. also testified at the 14-day involuntary commitment hearing. While J.D. testified that he could stay with his mom and knew substance use services were available, he chose to go to emergency rooms instead for "a spot for the night." CP at 95. J.D. also claimed he was willing to

attempt anything regarding medications, but then stated he "didn't even know" why he agreed to take medications at his current location. CP at 92.

Dr. O'Neill opined that J.D. was gravely disabled. She did not believe that a less restrictive alternative was viable due to J.D.'s lack of engagement and persistent delusional thoughts.

A superior court commissioner found that J.D. believed he was continually "being chased by others" and having to constantly "run from the pursuers" CP at 25. The court also found that Dr. O'Neill's judgment and insight was that J.D. "[c]annot control his actions given delusions." CP at 25. And that he "[i]s not medically stable and is not taking psychiatric [medication]." CP at 25. The commissioner specifically found that J.D. "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over [J.D.'s] actions and is not receiving such care as is essential for [J.D.'s] health and safety" due to a behavior health disorder. CP at 26. Additionally, the commissioner found that J.D.'s testimony was "very self serving and not entirely credible." CP at 26. The commissioner then concluded that J.D. was "gravely disabled." CP at 27.

J.D. filed a motion to revise the commissioner's order. At the hearing, State stated that J.D. was gravely disabled at the original hearing but after reading through the "cold, sterile transcript" he was "not so sure anymore." Report of Proceedings (RP) at 7. The superior court stated that "[t]he doctor did not believe that this was some kind of drug withdrawal psychosis" and that "usually when people are sober and relapse, there's some mental health issue they're dealing with." RP at 9. The court then noted that J.D. has since been released and "that's the whole point . . . a 14-day detainment . . . it seemed to have worked. Let's hope that's the case." RP at 10-11." The court denied the motion without entering separate findings of fact and conclusions of law.

J.D. appeals the superior court's order denying revision.

3

ANALYSIS

J.D. contends that substantial evidence does not support the court's finding of fact that he was not medically stable.[3] J.D. further contends that the findings of fact do not support the court's conclusion of law that he was gravely disabled under former RCW 71.05.020(24)(b). We disagree with both contentions.

I.     LEGAL PRINCIPLES

When reviewing a superior court's decision on involuntary commitment, we consider whether substantial evidence supports the court's findings of fact and whether those findings of fact support the court's conclusions of law and judgment. *In re Det. of A.F.*, 20 Wn. App. 2d 115, 125, 498 P.3d 1006 (2021), *review denied*, 199 Wn.2d 1009 (2022). We "view the evidence in the light most favorable to the petitioner," and we do not disturb decisions "regarding witness credibility or the persuasiveness of the evidence." *Id.* "Unchallenged findings of fact become verities on appeal." *In re Det. of W.C.C.*, 193 Wn. App. 783, 793 n.5, 372 P.3d 179 (2016).

After a motion to revise a commissioner's order, we "review the superior court's ruling, not the commissioner's decision." *In re Det. of L.K.*, 14 Wn. App. 2d 542, 550, 471 P.3d 975 (2020). When a superior court judge denies a motion to revise without entering findings of fact and conclusions of law, the commissioner's order and findings "'become the orders and findings of the superior court.'" *Id.* (quoting *Maldonado v. Maldonado*, 197 Wn. App. 779, 789, 391 P.3d 546 (2017)).

A person is gravely disabled if because of a mental disorder the person

(a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe

---

[3] The State alleges that J.D. waived this argument because he did not adequately address it in his opening brief. We disagree. J.D.'s discussion of this issue in his opening brief satisfies RAP 10.3(a)(6).

deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

Former RCW 71.05.020(24). The second requirement may include a showing that "the individual is *unable*, because of severe deterioration of mental functioning, to make a rational decision with respect to his or her need for treatment." *In re Det. of LaBelle*, 107 Wn.2d 196, 208, 728 P.2d 138 (1986).

## II. NOT MEDICALLY STABLE FINDING

Dr. O'Neill testified that J.D.'s delusional thoughts interfered with his judgement and insight. She explained that J.D. consistently refused medications, "sometimes in anger" because he "[d]oesn't think he needs it. Doesn't understand it's a mental health issue." CP at 71. Dr. O'Neill also testified to J.D.'s methamphetamine use. Dr. O'Neill opined that J.D.'s symptoms were inconsistent with being solely caused by methamphetamine use because even after detoxing from methamphetamine, J.D.'s delusional thoughts continued. J.D. also testified that while he went to the emergency room often, he chose to go to the emergency room for "a spot for the night." CP at 95. This shows his primary intention was not medical treatment, but rather for housing. J.D. also claimed he was willing to attempt anything regarding medications, but then stated he "didn't even know" why he agreed to take medications at his current location. CP at 92.

Based on the above, substantial evidence exists to support the superior court's finding of fact that J.D. was not medically stable, which goes to his ability to receive such care as is essential for his health or safety.

## III. GRAVELY DISABLED CONCLUSION

Our focus is on whether J.D. had a significant loss of cognitive or volitional control and was not receiving, or would not receive, such care that was essential to his health or safety. Former

RCW 71.05.020(24)(b).  Here, the superior court found that J.D. believed people were after him. Dr. O'Neill's judgment and insight was that J.D. "[c]annot control his actions given delusions." CP at 25.  And that he "[i]s not medically stable and is not taking psychiatric [medication]."  CP at 25.  The court specifically found that J.D. "manifests severe deterioration in routine functioning evidenced by a repeated and escalating loss of cognitive or volitional control over [J.D.'s] actions and is not receiving such care as is essential for [J.D.'s] health and safety" due to a behavior health disorder.  CP at 26.  These findings are sufficient to support the conclusion that J.D. had a significant loss of cognitive or volitional control.

The superior court's findings that J.D. was not medically stable, not taking psychiatric medication, and continued to act on delusional thoughts show a severe deterioration of mental functioning, which limited his ability to make rational decisions with respect to his needs for treatment.  These findings are sufficient to support the conclusion that J.D. would not receive essential care if released.  Therefore, the findings of fact support the court's conclusion that J.D. was gravely disabled.[4]

---

[4] J.D. also alleges that the superior court improperly relied on speculation based on the court's comments during the revision hearing regarding mental health and relapsing.  But the superior court did not enter findings of fact and conclusions of law when denying J.D.'s motion to revise. Therefore, as discussed above, the commissioner's order and findings become the superior court's orders and findings.  *In re Det. of L.K.*, 14 Wn. App. 2d at 550.  Our review is limited to the findings of fact and conclusions of law and not comments during a revision hearing.  *In re Det. of A.F.*, 20 Wn. App. 2d at 125.  Therefore, any improper comment during the revision hearing would be harmless error.  *See In re Det. of Pouncy*, 168 Wn.2d 382, 391, 229 P.3d 678 (2010) (an error which is trivial or merely academic is harmless and not prejudicial to the substantial rights of a party).

57433-1-II

## CONCLUSION

We conclude that substantial evidence supports the superior court's finding that J.D. was medically unstable and the court's conclusion that J.D. was gravely disabled. Accordingly, we affirm the superior court's order denying revision of the 14-day involuntary commitment order.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Veljacic, J.

We concur:

_____
Cruser, A.C.J.

_____
Price, J.

7