**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| In re Matter of the Detention of: | No. 59098-1-II |
| G.H. | UNPUBLISHED OPINION |
| Appellant. | |

MAXA, J. – GH appeals the trial court order extending his involuntary civil commitment for an additional 180 days based on the conclusion that he was gravely disabled. We hold that substantial evidence supports the trial court's gravely disabled finding under RCW 71.05.020(25)(b).[1] Therefore, we affirm the trial court's involuntary commitment order.

FACTS

After the State charged GH with third degree assault in King County, the King County Superior Court found that GH was incompetent to stand trial. The King County Superior Court dismissed the third degree assault charge without prejudice and committed GH to Western State Hospital (WSH) for further evaluation.

WSH staff filed a petition for 180-days of involuntary treatment. In November 2022, the trial court found that GH was gravely disabled and that he presented a substantial likelihood of repeating similar criminal acts and granted the petition for 180 days of involuntary treatment.

---

[1] The legislature amended this statute in 2023. Laws of 2023 ch. 433 §3; ch. 425 §20. Because these amendments did not change the text of this subsection, we cite to the current version of the statute.

In April 2023, Junko Yasuda-Free, D.O. and Nicholas McLain, Ph.D. filed a petition to extend the November 2022 involuntary commitment for an additional 180 days. Yasuda-Free and McLain alleged that GH continued to be gravely disabled.

A superior court commissioner held a bench trial on this petition. McLain and GH testified.

McLain testified that GH had been diagnosed with schizoaffective disorder bipolar type and that he experienced paranoia and delusions as part of this disorder. GH previously had been admitted to WSH in 1994, 2018, and 2021. GH had also been civilly committed at another institution in 2011 and had received additional outpatient treatment between 2001 and 2017.

McLain further testified that he had reviewed GH's notes and observed GH on the ward and that he had interacted and spoke with GH on the ward on April 23. When GH learned that McLain was attempting to evaluate his mental status for the court, GH quickly became agitated, upset, and irritated. GH refused to talk to McLain and stated that he was going to retain an attorney and sue WSH for $24 million. GH then asked a staff member "to call an apartment building for him or something like that." Clerk's Papers (CP) at 91. McLain testified that although GH was able to directly communicate that he did not want to speak with McLain, GH's comments about suing WSH and apparently wanting staff to find him a place to live did not make sense. McLain was unable to complete the mental status exam. Despite GH's negative reaction to McLain, McLain testified that GH appeared to be able to interact appropriately with other people on the ward at that time.

McLain also testified that GH had been participating in treatment while at WSH. Despite being largely compliant with his treatment and only once having refused medication, GH had

continued to experience psychosis, including auditory hallucinations, paranoia, grandiose delusions, vacillating moods, and agitation throughout the current reporting period.

McLain stated that GH had been placed in seclusion at the end of December 2022, and that he had to be physically restrained in January and February 2023. During the January incident, GH broke his wheelchair and was using parts of the wheelchair to hit the badge reader that controlled access to the ward. Security had to intervene. Around the time of the January and February incidents, GH was having problems and demanding to be released. He would block doorways and did not want others to come and go from the unit. McLain opined that GH's disruptive behavior in January and February was related to the ongoing delusions or beliefs.

Based on his review of GH's records and his contact with GH, McLain concluded that although GH had periods of time during which he was safe and stable, GH still was experiencing episodes where his judgment and cognitive and volitional control was affected by his delusional thinking and the voices he was hearing. This was demonstrated by incidents that occurred in December, January, and February, and by the fact GH quickly could become irritable, agitated, and emotionally reactive. But McLain noted that starting in March, GH had demonstrated some improvement and that he was hopeful that GH would continue to improve.

McLain also concluded that GH did not have insight into his mental health condition. McLain noted that GH had on one occasion refused to agree to lab work that could be necessary to ensure that his treatment was safe. McLain opined that GH would not be able to consistently meet his basic health and safety needs as a result of his behavior health disorder and that GH would not be capable of making rational decisions regarding his treatment if he was released.

Although McLain was unable to give an opinion regarding whether GH would seek out and follow through on mental health treatment if released because of his limited contact with

GH, McLain believed that GH was at risk of "revolving door phenomenon" and that this was a major factor weighing against releasing GH. McLain opined that during the continued detention, the goal should be symptom reduction and that this might require medication adjustments. Ultimately, McLain opined that GH continued to be gravely disabled as a result of his behavioral health disorder and that a less restrictive alternative would not be appropriate at that time.

GH testified that he wanted to be released. He testified extensively about his access to financial resources and his plans to acquire housing and employment upon release. He testified that he had enough funds to stay at Extended Stay America for one night, and then he hoped to receive funds from the Department of Health and Social Services and a refund from Social Security. He stated that he might end up at Union Gospel Mission, but he hoped to obtain an apartment once he received additional funds.

Regarding his continuing mental health care, GH testified that he intended to continue his mental health care in the community and that he intended to continue taking his antipsychotic medication because he had found it helpful. He stated that he had memorized a provider's phone number, that this provider could provide the necessary services, and that he had made plans with them. GH also noted that he had successfully obtained healthcare treatment in the community in King County for 16 years.

After hearing the testimony, the commissioner found that as a result of his behavioral health disorder, GH continued to manifest severe deterioration in his routine functioning and, as evidence by repeated and escalating loss of cognitive or volitional control over his actions, was not receiving such care as is essential for his health and safety. Based on this finding, the commissioner granted the petition. The commissioner also concluded that a less restrictive alternative was not in the best interests of GH or others.

GH appeals the 180-day extension of his involuntary commitment.

ANALYSIS

A.    STANDARD OF REVIEW

When the superior court decides a motion to revise an order granting a petition for involuntary treatment, we review de novo the superior court's decision, not the commissioner's decision. *In re Det. of L.K.*, 14 Wn. App. 2d 542, 550, 471 P.3d 975 (2020). But we review the superior court's decision " 'based on the evidence and issues presented to the commissioner.' " *Id*. (quoting *In re Vulnerable Adult Pet. for Winter*, 12 Wn. App. 2d 815, 829, 460 P.3d 667 (2020)). The commissioner's findings and orders, if not successfully revised, become the orders and findings of the superior court. *L.K.*, 14 Wn. App. 2d at 550.

When reviewing a superior court's decision on involuntary commitment for sufficient evidence, we consider whether substantial evidence supports the court's findings of fact and whether those findings of fact support the court's conclusions of law and judgment. *In re Det. of A.F.*, 20 Wn. App. 2d 115, 125, 498 P.3d 1006 (2021), *review denied*, 199 Wn.2d 1009 (2022). We "view the evidence in the light most favorable to the petitioner," and we do not disturb decisions "regarding witness credibility or the persuasiveness of the evidence." *Id.*

B.    LEGAL PRINCIPLES

RCW 71.05.320(4) provides that after an initial involuntary commitment period, the professional person in charge of the facility in which a person is committed may file a new petition for involuntary treatment on various grounds. Relevant here, a new petition may be filed on the ground that the person continues to be gravely disabled. RCW 71.05.320(4)(d).

"Gravely disabled" is defined as:

> a condition in which a person, as a result of a behavioral health disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her

essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

RCW 71.05.020(25). The trial court found GH gravely disabled under subsection (b). This subsection enables the State to provide the kind of continuous care and treatment that can break "revolving door syndrome," a cycle in which patients repeatedly move from hospitalization to insecure situations, relapse, and then are rehospitalized. *In re Det. of LaBelle*, 107 Wn.2d 196, 206, 728 P.2d 138 (1986).

When a petitioner seeks to prove that a person is gravely disabled under RCW 71.05.020(25)(b), they must show (1) "recent proof of significant loss of cognitive or volitional control" and (2) "a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for [their] health or safety." *LaBelle*, 107 Wn.2d at 208. The second requirement may include a showing that "the individual is unable, because of severe deterioration of mental functioning, to make a rational decision with respect to [their] need for treatment." *Id.* (emphasis omitted).

C.      SUFFICIENCY OF EVIDENCE UNDER SUBSECTION (b)

GH argues that the evidence was insufficient to prove that he was gravely disabled during the relevant time period. We disagree.

GH claims that the State failed to present evidence that he would not receive such care as is essential for his health or safety if released because he presented evidence that he was able to feed and care for himself if released.[2] He specifically notes that he testified that he would have

---

[2] GH also asserts that the evidence was insufficient to establish that he was gravely disabled under subsection (a) because he was unable to provide for his essential needs. Because the superior court did not find that GH was gravely disabled under subsection (a), we do not address that argument.

financial resources to secure housing, that he planned to obtain employment, that he would continue his mental health treatment, that his brother would assist him, and that he had the ability to function from day to day.

GH's testimony could suggest that he would have access to shelter and other resources and that he intended to continue treatment if he was to be released. But we must examine all of the evidence, not just GH's testimony. And we must view that evidence in the light most favorable to the petitioners when examining the sufficiency of the evidence. *A.F.*, 20 Wn. App. 2d at 125.

McLean's testimony, taken in the light most favorable to the petitioners, established that despite being compliant with his treatment, GH continued to experience grandiose and paranoid delusional thinking, auditory hallucinations, vacillating moods, and agitation and he had continued to engage in disruptive behavior. McLean also testified that this demonstrated that GH was still experiencing mental health episodes that affected his judgment and cognitive and volitional control. And GH's agitation and comments to McLean regarding suing WSH and demanding the staff find him housing when he learned that McLean was attempting to interview him demonstrated that GH was experiencing cognitive issues as recently as a month before the trial.

In addition, McLean testified that GH did not have insight into his mental health condition and that it was his professional opinion that GH would not be capable of making rational decisions regarding his treatment if he was released. Although there was little evidence regarding GH's insight into his condition or treatment, there was evidence that GH had refused lab work that could be necessary to ensure that his treatment was safe. Taken in the light most

favorable to the petitioners, this demonstrates a lack of ability to make rational decisions regarding his treatment.

And McLean expressed concern that GH was at risk of "revolving door phenomenon" and that this was a major factor weighing against release. CP at 95-97. GH's history of mental health treatment, including that he had been subject to two prior hospitalizations within three years of his current hospitalization, supports McLean's concern that GH would not remain compliant with his treatment if released and that he would quickly decompensate.

Viewing this evidence in the light most favorable to the petitioners, we conclude that the evidence presented would allow the trial court to find by clear, cogent, and convincing evidence that GH showed a recent loss of cognitive control due to a behavioral health disorder and that he would not receive care that is essential for his health or safety if released. Accordingly, this evidence supports the gravely disabled finding under RCW 71.05.020(25)(b).

## CONCLUSION

We affirm the trial court's involuntary commitment order.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, J.

We concur:

_____
CRUSER, C.J.

_____
PRICE, J.