**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| In the Matter of the Detention of | No. 57773-9-II |
| A.O.-A. | |
| Appellant. | UNPUBLISHED OPINION |

CRUSER, A.C.J. — AO-A was involuntarily committed based on a civil conversion following the dismissal of his charges of two counts of rape of a child in the first degree. AO-A appeals the trial court's order extending his involuntary commitment for an additional 180 days of mental health treatment. AO-A argues that the State failed to prove that he was gravely disabled. We affirm the trial court's commitment order because the finding that AO-A was gravely disabled was supported by clear, cogent, and convincing evidence.

FACTS

I. BACKGROUND

AO-A is 48 years old. In 2008, he was charged with two counts of rape of a child in the first degree for incidents that occurred in 1999 and 2002, when AO-A allegedly molested his cousin's minor daughter. His case went to trial and he was found guilty by a jury, but the sentencing judge ultimately overturned his conviction after finding that AO-A had been incompetent to stand trial. He was first evaluated in 2010, at which point he was diagnosed with borderline intellectual

functioning, but the evaluator did not note any psychotic symptoms. His charges were dismissed and he remained in the King County Jail for nearly a decade before being civilly committed to Western State Hospital (WSH) in 2020. Between 2010 and 2020, AO-A underwent six competency evaluations. He was found to be incompetent in 2010, competent in 2012 and 2019, and then incompetent again during two evaluations in 2020. No opinion was offered from the physician who conducted the second evaluation, which was in 2011. It was not until the evaluation in 2020 that AO-A was diagnosed with a psychosis-related disorder. Specifically, he was diagnosed with "Unspecified Schizophrenia Spectrum and Other Psychotic Disorder." Clerk's Papers (CP) at 54.

## II. PETITION TO EXTEND INVOLUNTARY TREATMENT

In September 2022, doctors from WSH petitioned the superior court for an additional 180 days of involuntary treatment for AO-A. The doctors, Peter Bingcang, MD, and Rosario Archer, PhD, alleged in their petition that AO-A remained gravely disabled but opined that he was ready for a less restrictive alternative (LRA) placement once an appropriate placement became available.

## III. HEARING

A. Dr. Archer's Testimony

Dr. Archer, an evaluator for the Commitment Center at WSH, was the first witness to testify at the commitment hearing. Her testimony was based on the mental status examination (MSE) she conducted, interactions with AO-A's health providers and treatment team, a review of AO-A's medical records, as well as the multiple occasions on which she observed AO-A during her visits to the WSH ward where he resides. She conducted the MSE in Spanish, AO-A's native language, because when he initially approached her, he spoke in Spanish and indicated that he felt fully comfortable speaking in Spanish. Dr. Archer conducted the MSE in-person, which she opined was

important in that it provided her the opportunity to observe his body language and the small physical movements he made throughout the evaluation.

Dr. Archer opined that AO-A has "a mental health disorder labeled as unspecified schizophrenia spectrum disorder or other psychotic disorder." *Id.* at 245. She testified that during the evaluation, AO-A "displayed delusional ideation, [and] auditory and visual hallucination." *Id.* AO-A told Dr. Archer that he could hear spirits speaking to him from the corner of the room. He spoke of his belief that the sun was guiding him in his life and directing his departure from WSH. Dr. Archer testified that AO-A's hospital record notes that he repeated similar beliefs regarding spirits, God, and demons during his interactions with other WSH staff.

During the evaluation, AO-A frequently interrupted Dr. Archer and presented "unstable mood, demanding behavior," and agitation. *Id.* at 246. AO-A demanded that Dr. Archer open the doors to the hospital to release him. Dr. Archer testified that AO-A repeatedly interrupted her, exhibited an unregulated mood, as well as a disorganized and confused thought process. She unsuccessfully tried to redirect AO-A when he became agitated and went off track. AO-A told Dr. Archer that he was the victim of a plot who had been kidnapped against his will and WSH staff were infringing upon his liberty. Additionally, AO-A stated that he did not have a mental illness and refused psychotropic medications. Regarding AO-A's cognitive and volitional control, Dr. Archer explained that AO-A has not exhibited any aggressive behavior at WSH, but opined that his cognitive control is impaired as evidenced by his irrational thoughts, agitation, and demanding behavior.

Dr. Archer opined that AO-A would not be able to meet his basic health and safety needs if he were to be released from WSH at the time of the hearing. She testified that he would not be

able to attend to the needs of his diagnosis because he did not demonstrate an awareness of his disorder, and therefore was unable to make rational decisions regarding treatment. Dr. Archer said AO-A's judgment was impaired and provided an example where she asked him "What goes through your mind when I tell you there's no use to cry over spilled milk?" His response was "I would clean the milk on the floor. I like to clean here in the ward."[1] *Id.* at 251.

While AO-A attended to his hygiene and appearance, he was reportedly uncooperative with a social worker in preparing potential discharge plans. Dr. Archer was concerned that AO-A did not allow the social worker to contact his sisters who he planned to stay with upon release and explained that AO-A would not be deemed ready for release until he participated more actively in discharge planning. Additionally, Dr. Archer expressed concern that if AO-A was released from WSH, he may neglect his needs and could decompensate, especially given the ways in which his delusional thinking may prevent him from seeking help and making rational decisions. In support of her opinion that AO-A would not function successfully in the community at that time, Dr. Archer explained that AO-A participates minimally in group therapy, he is disruptive when he does participate and acts hostile and argumentative, he is difficult to redirect, and he refuses to take psychotropic medications. Moreover, Dr. Archer testified that AO-A appears to be unaware of his disorder, and unaware that his behaviors are inappropriate and disruptive.

In conclusion, Dr. Archer's opinion was that AO-A needed to remain at WSH until an appropriate LRA was identified for him in order to ensure that his basic health and safety needs would be met.

---

[1] At no point did Dr. Archer clarify whether that saying is common in Spanish or in El Salvador, where AO-A migrated from. While Dr. Archer is also a native Spanish speaker, she came to the United States from Spain, not El Salvador.

B. Dr. Stanfill's Testimony

Defense counsel called Dr. Michael Stanfill to testify. Dr. Stanfill holds a doctorate in clinical psychology. He previously worked as the psychiatric services director for the King County jail system, and as a part-time forensic evaluator for the Special Commitment Center. Dr. Stanfill conducted two evaluations of AO-A, one a month prior to the hearing in question, and another roughly a year before that, when Dr. Stanfill evaluated AO-A for a previous civil commitment petition. In preparation of those evaluations, Dr. Stanfill reviewed the previous competency evaluations of AO-A within the past decade. He spoke with AO-A in English and via Zoom.

During his first evaluation of AO-A, Dr. Stanfill administered two psychological measures aimed to assess risk of recidivism in sex offenses. The measures are known as Static-99 and STABLE-2007. He found that AO-A "was in the low risk range, low risk categorization of potential sexual reoffense." *Id.* at 276.

Dr. Stanfill agreed with both the initial borderline intellectual functioning diagnosis, and with the diagnosis of unspecified schizophrenia or other psychotic disorder. He also confirmed that according to the record, AO-A refuses to take antipsychotic medications at WSH. AO-A did not tell Dr. Stanfill that he would seek treatment in the community if released. Dr. Stanfill explained that throughout AO-A's competency evaluations he has "consistently presented with some amount of what has been conceptualized and deemed by numerous evaluators and clinician[s] as delusions, often with a religious preoccupation." *Id.* at 278.

Dr. Stanfill noted a "complete lack of aggression" in AO-A's hospital records. *Id.* at 285. Dr. Stanfill opined that AO-A exhibited cognitive control over his actions and provided an example where AO-A demonstrated that control in a potentially agitating and exacerbating situation. In that

situation, AO-A's roommate at WSH repeatedly used AO-A's toothbrush and spit on his clothes. AO-A was able to maintain cognitive control over his actions and handle the situation appropriately by first asking his roommate to stop, and when that did not work, going to staff and asking them to intervene. According to Dr. Stanfill, there is "no evidence of any concerns in [AO-A's] ability to meet his essential human needs both before his incarceration, during, or his time while at Western." *Id.* at 283-84.

C. AO-A's Testimony

AO-A testified briefly at the hearing. He testified that if he were to be released from WSH, he would go stay at his sister's house and begin looking for a job. He testified that prior to his commitment, he always held a job and has various skillsets. He also testified that he would not seek mental health treatment upon release. He did not believe that he suffered from a mental illness and testified, "I have no problems. I've never had any problems." *Id.* at 305.

D. Court's Ruling

In the findings of fact and conclusions of law, the court found that AO-A continued to be gravely disabled due to his behavioral health disorder, and manifested "severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over actions." *Id.* at 156. Additionally, the court found that an LRA was in AO-A's best interest.

The court determined that AO-A presented a "significant loss of cognitive control," and that based on the evidence presented, it was highly-probable that AO-A "would not receive such care as is essential for his health and safety if discharged without a[n LRA] order." *Id.* at 163. Additionally, the court found that "it is highly probable that [AO-A's] cognitive control is significantly impaired." *Id.* The court based this finding on AO-A's undisputed unspecified

6

schizophrenia spectrum or other psychotic disorder, auditory and visual hallucinations, unstable mood, agitation, rapid speech, "delusional ideations regarding spirits and the Father Sun," "perseverating on being the victim of a plot and on discharging from WSH," "and impaired insight and judgment as evidenced by his non-compliance [in regard to] prescribed psychiatric medications even within the hospital." *Id.*

The court determined that AO-A would not receive essential care for his health and safety if he were released without an LRA. This finding was based, in part, on AO-A's decision not to participate in discharge planning from the hospital and failure to comply with psychiatric medication, as well as his testimony that he would not seek treatment if released. As such, the court concluded, AO-A was unable to make rational decisions regarding his treatment. The court ultimately found that AO-A was gravely disabled under prong (b), and found that an LRA was in his best interest. Because no appropriate LRA was available at the time, the court ordered up to 180 days of intensive inpatient treatment.

The court's ruling, in part, was based on its finding that Dr. Archer's testimony was slightly more credible than that of Dr. Stanfill because Dr. Archer spoke with AO-A in Spanish, his native language, and they met in-person, rather than via Zoom.[2]

---

[2] AO-A filed a motion to revise, arguing that the evidence presented in the petition and at the commitment hearing was not sufficient to support a finding that AO-A was gravely disabled. The superior court agreed with the commissioner that the State satisfied their burden and proved that AO-A was gravely disabled by clear, cogent, and convincing evidence. Accordingly, the superior court denied the motion for revision. Following a motion to revise a commissioner's order, we "review the superior court's ruling, not the commissioner's decision." *In re Det. of L.K.*, 14 Wn. App. 2d 542, 550, 471 P.3d 975 (2020). "[T]he findings and orders of a court commissioner not successfully revised become the orders and findings of the superior court." *Maldonado v. Maldonado*, 197 Wn. App. 779, 789, 391 P.3d 546 (2017).

## ANALYSIS

### I. STANDARD OF REVIEW

When reviewing the trial court's involuntary commitment order, we consider whether, taking the evidence in the light most favorable to the State, the trial court's findings of fact are supported by substantial evidence and whether the court's findings of fact support its conclusions of law and judgment. *In re Det. of T.C.*, 11 Wn. App. 2d 51, 56, 450 P.3d 1230 (2019); *In re Det. of B.M.*, 7 Wn. App. 2d 70, 85, 432 P.3d 459 (2019). " 'Substantial evidence' is the quantum of evidence sufficient to persuade a fair-minded person." *In re Det. of H.N.*, 188 Wn. App. 744, 762, 355 P.3d 294 (2015). We do not review a trial court's decision regarding witness credibility or the persuasiveness of the evidence. *In re Det. of A.F.*, 20 Wn. App. 2d 115, 125, 498 P.3d 1006 (2021), *review denied*, 199 Wn.2d 1009 (2022).

### II. GRAVE DISABILITY

AO-A argues that the "State failed to prove by clear, cogent, and convincing evidence that at the time of the hearing, [AO-A] was experiencing recent, significant, repeated, and escalating loss of cognitive or volitional control." Br. of Appellant at 26. Additionally, AO-A argues that the State failed to prove that AO-A would not receive essential care if released from WSH.

A. Legal Principles

The State bears the burden of establishing a person is gravely disabled by clear, cogent, and convincing evidence. *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). Clear, cogent, and convincing evidence means that the ultimate fact at issue is shown to be " 'highly probable.' " *Id.*

Under chapter 71.05 RCW, a person "may be involuntarily committed for treatment of mental disorders if, as a result of such disorders, they . . . are gravely disabled." *Id.* at 201-02. "Gravely disabled" is defined in relevant part as:

> a condition in which a person, as a result of a behavioral health disorder: . . . manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

RCW 71.05.020(25)(b).

This provision enables the State to provide the kind of continuous care and treatment that can break " 'revolving door' syndrome, in which patients often move from the hospital to dilapidated hotels or residences or even alleys, parks, vacant lots, and abandoned buildings, relapse, and are then rehospitalized, only to begin the cycle over again." *LaBelle*, 107 Wn.2d at 206.

To prove that AO-A manifested a severe deterioration in routine functioning, the evidence had to establish a "recent proof of significant loss of cognitive or volitional control." *Id.* at 208. Additionally, petitioners must produce evidence of "a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety." *Id.* "Implicit in the definition of gravely disabled . . . is a requirement that the individual is unable, because of severe deterioration of mental functioning, to make a rational decision with respect to [their] need for treatment." *Id.* (emphasis omitted).

B. Application

Here, the trial court was presented with clear, cogent, and convincing evidence that AO-A was gravely disabled. The petitioners' evidence showed that AO-A had a psychotic disorder, denied having a mental disorder, experienced delusional thinking, refused to take medication,

exhibited agitation and rapid speech, would be unlikely to meet his basic health and safety needs if released, and would not seek treatment if released to the community.

### 1. Severe Deterioration in Routine Functioning

AO-A argues that the record is insufficient to prove that he experienced severe deterioration in routine functioning or escalating decompensation. He asserts that the State needed to prove that his condition had worsened in order for the court to find that he was gravely disabled. However, this understanding misinterprets the statute and *LaBelle*. Explaining the rationale behind the legislature's expansion of grave disability under the statute, the supreme court in *Labelle* rejected an interpretation of former RCW 71.05.020(1)(b) (1979) that would "exclude those persons whose condition has stabilized or improved, even if minimally (*i.e.*, is not 'escalating'), by the time of the commitment hearing." *Id*. at 205. The supreme court cautioned that such an interpretation would

> result in absurd and potentially harmful consequences, for a court would be required to release a person whose condition, as a result of the initial commitment, has stabilized or improved minimally—*i.e.*, is no longer "escalating"—even though that person otherwise manifests severe deterioration in routine functioning and, if released, would not receive such care as is essential for his or her health or safety.

*Id*. at 207. AO-A's circumstances present the potential for decompensation that the supreme court in *Labelle* cautioned against, wherein a committed individual has benefited from treatment but not so extensively so as to no longer meet the definition of grave disability under RCW 71.05.020(25)(b). With respect to the first requirement under RCW 71.05.020(25)(b), while AO-A did not display outright aggression, and examples of his recent deterioration may have been minimal, he continued to exhibit cognitive challenges related to his lack of insight into his condition. In particular, AO-A continuously denied that he had a mental health condition. AO-A

also disagreed that he would benefit from medication, refused to take it, and indicated that he would not seek treatment upon discharge from WSH. While in treatment, AO-A expressed delusions related to the reasons for his confinement, explaining that he was at WSH because he was the victim of a plot.

### 2. *Essential Care*

AO-A also argues that the record does not establish that he would not receive such care as is essential for his health or safety if released. He maintains that the State failed to show that his health would be at risk if released, even if he continues to refuse psychotropic medication. Additionally, he argues that his lack of participation in discharge planning does not amount to proof of grave disability, and neither do the hospital's concerns about AO-A's plan to live with his sisters and rely on their support.

AO-A is correct that uncertainty of living arrangements and lack of resources cannot alone establish that he would not receive such care as is essential for his health or safety. *LaBelle*, 107 Wn.2d at 210 ("[U]ncertainty of living arrangements or lack of financial resources will not alone justify continued confinement in a mental hospital."). Moreover, "mental illness alone is not a constitutionally adequate basis for involuntary commitment." *Id.* But Dr. Archer did not just express concern about AO-A's living arrangements, resources, or the fact that he has been diagnosed with a psychotic disorder.

Dr. Archer also testified that AO-A was not capable of making rational decisions regarding his treatment. He denied having a mental disorder, refused to take medication, experienced delusional thinking and hallucinations incongruent with reality, exhibited impaired judgment, and

made it clear that he would not seek treatment if released from WSH. He also exhibited agitation, disruptiveness, hostility towards others, and unstable mood.

Although Dr. Stanfill testified that AO-A did not present a risk of reoffending, exhibited cognitive control, did not exhibit aggression, and showed promise regarding his ability to function successfully in society, the court gave more weight to Dr. Archer's testimony. The court explained that it found Dr. Archer's testimony to be slightly more credible because she spoke with AO-A in his native language and conducted the evaluation in-person rather than via video. We do not review a trial court's decision regarding witness credibility or the persuasiveness of the evidence. *A.F.*, 20 Wn. App. 2d at 125.

Taking Dr. Archer's testimony and AO-A's history in the light most favorable to the State, the evidence was sufficient to establish that AO-A would not receive such care as is essential for his health or safety if released. Thus, the evidence was sufficient to establish that the State proved that AO-A was gravely disabled by clear, cogent, and convincing evidence.

CONCLUSION

We conclude that the State presented sufficient evidence to support the court's finding that AO-A was gravely disabled. Therefore, we affirm the superior court's commitment order.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, A.C.J.

We concur:

MAXA, J.

PRICE, J.